**GENERAL ACQUISITION, INC., et al., Plaintiffs,**

v.

**GENCORP INC., et al., Defendants.**

**GENCORP INC., Defendant–Counterclaimant,**

v.

**WAGNER & BROWN, et al., Defendants on the Counterclaims,**

**and**

**Shearson Lehman Hutton, Inc., et al., New Party Defendants on the Amended Counterclaims.**

No. C–2–87–0348.

United States District Court, S.D. Ohio, E.D.

May 25, 1990.

Thomas W. Hill, Melvin D. Weinstein, Emens, Hurd, Kegler & Ritter, Columbus, Ohio, for GenCorp, Inc., defendant-counterclaimant.

James E. Pohlman, Daniel W. Costello, Porter, Wright, Morris & Arthur, Columbus, Ohio and Willkie Farr & Gallagher, New York City, for counterclaim-defendant, Shearson Lehman Bros. Inc., new party defendant on the Amended Counterclaims.

## OPINION AND ORDER

KINNEARY, Senior District Judge.

This matter comes before the Court to consider the motion of Shearson Lehman Hutton, Inc. ("Shearson") and Shearson Lehman Brothers Holdings, Inc. ("SLB Holdings") for dismissal of the Counterclaims of GenCorp, Inc. ("GenCorp") under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. SLB Holdings also moves for dismissal of the Counterclaims for lack of personal jurisdiction. Fed.R. Civ.P. 12(b)(2).

In considering a motion for dismissal, the Court is mindful that dismissal of a counterclaim for failure to state a claim upon which can be granted is appropriate only in limited circumstances. A district court may not dismiss a claim under Rule 12(b)(6) for failure to state a claim unless it is apparent beyond a doubt to the court that the plaintiff can prove no set of facts to support a claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In determining whether the facts presented in a counterclaim support a claim upon which relief can be granted, the district court must liberally construe the facts in the light most favorable to the counterclaim plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357, at 594 (1969) [hereinafter 5 C. Wright].

In considering whether the plaintiff sets forth in the counterclaim a claim upon which relief can be granted, the court must remain cognizant of the liberal pleading requirements embodied in the Federal Rules of Civil Procedure. Rule 8(a)(2) only requires " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Conley*, 355 U.S. at 47, 78 S.Ct. at 103.

[T]he function of pleadings under the Federal Rules is to give fair notice of the claim asserted so as to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of res judicata, and to show the type of case brought so that it may be assigned to the proper form of trial.

*Atlas Chem. Indus., Inc. v. Moraine Prods.*, 509 F.2d 1, 7 (6th Cir.1974) (quoting 2A J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 8.13, at 8–61 to 62 (2d ed. 1989) [hereinafter 2A J. Moore] ). "Under the 'notice' theory of pleading it is immaterial whether the pleadings states 'conclusions' or 'facts' as long as fair notice is given and the statement or claim is short and plain." 2A J. Moore, *supra*, ¶ 8.13, at

8–66. There is no requirement that the claimant provide in detail the facts upon which his claim is premised so long as his opponent is apprised as to the basis of his claim and ground in support thereof. *Conley*, 355 U.S. at 47, 78 S.Ct. at 103. Indeed, "[t]here is no requirement that the pleading state 'facts,' or 'ultimate facts,' or 'facts sufficient to constitute a cause of action.'" 2A J. Moore, *supra*, ¶ 8.13, at 8–60.

Obviously, what constitutes a "short and plain" statement is dependent upon such considerations as the nature of the suit and the relief sought, among other factors. The Court is mindful, however, that in evaluating a plaintiff's counterclaim the pleading requirements embodied in Rule 8(a) apply to all actions in the federal courts.[1] The need for the pleader to interpose only "a short and plain statement of the claim showing that the pleader is entitled to relief" governs "every case, regardless of its size, complexity, or the number of parties" involved. 5 C. Wright, *supra* p. 2, § 1217, at 127, § 1221, at 149. The principles underlying Rule 8(a)(2) equally control a district court's disposition of an action for recovery of $1,000 just as they do a multi-million dollar claim, such as in the case at bar. The amount prayed for by the plaintiff does not heighten the court's scrutiny.

In addition, while undoubtedly the plaintiff will be required to prove all elements to recover successfully under its various claims, a counterclaim cannot be dismissed simply because the plaintiff has failed to state precisely all elements that give rise to the alleged legal basis for recovery. *Bramlet v. Wilson*, 495 F.2d 714, 716 (8th Cir.1974); *Ambling v. Blackstone Cattle Co.*, 658 F.Supp. 1459, 1462 (N.D.Ill.1987); *Miener v. Special School Dist.*, 607 F.Supp. 1425, 1427 (E.D.Mo. 1985), *aff'd in part, rev'd in part on other grounds, Miener By and Through Miener v. Missouri*, 800 F.2d 749 (1986); *Southwest Inv. I v. Midland Energy Co.*, 596 F.Supp. 219, 221 (E.D.Mo.1984); *Comerio v. Beatrice Foods Co.*, 595 F.Supp. 918, 920

(E.D.Mo.1984); 5 C. Wright, *supra* p. 2, § 1216, at 120. Granted, some courts have held otherwise and required the pleading of each essential element of the claim alleged. *See, e.g., Laxalt v. McClatchy*, 622 F.Supp. 737, 740 (D.Nev.1985); *Briggs v. Sterner*, 529 F.Supp. 1155, 1164 (S.D.Iowa 1981). However, to embrace this view would essentially be a return to the common law practice of testing the legal sufficiency of a complaint by the means of a demurrer. Under such a practice, a party's claim could be lost by its attorney's failure to draft the counterclaim properly, despite the validity of the claim. 5 C. Wright, *supra* p. 2, § 1355, at 587. Such a practice would effectively eliminate the "notice" pleading theory codified in the Federal Rules of Civil Procedure. So long as the counterclaim sets forth sufficient facts by which the elements of the offense are reasonably inferred, it can withstand the scrutiny of a Rule 12(b)(6) motion.

Given the Court's duty to construe the facts in the light most favorable to the counterclaim plaintiff, the Court must accept the factual allegations contained in GenCorp's Counterclaims and any inferences to be drawn therefrom for purposes of considering this motion. Thus, the factual statement provided below is essentially an adoption and republication of GenCorp's statement of facts. The Court notes that the following does not constitute a finding of fact; it is merely a summary of the allegations contained in GenCorp's Counterclaims.

This action arises out of a tender offer commenced by General Partners on March 18, 1987 to purchase for cash all outstanding shares of GenCorp's common stock. General Partners terminated its tender offer on April 6, 1987, a move prompted by GenCorp's announced self-tender of fifty-four percent of its shares.

As part of its Second Amended Answer and Counterclaims, GenCorp filed the instant Counterclaims. Although General Partners and its related entities are named as counterclaim defendants, a consent or-

---

1. This statement is qualified when the underlying claim is governed by Rule 9. The most notable exception is a plaintiff's requirement to plead with particularity all averments of fraud or mistake. Fed.R.Civ.P. 9(b).

der filed on May 8, 1987 provided for their dismissal. Hence, the only claims pending now before the Court are GenCorp's claims against Shearson and SLB Holdings.

Shearson served as the investment and financial advisor for GenCorp in conjunction with two GenCorp financial matters. Second Amended Answer and Counterclaims ¶ 124. In the course of this relationship, GenCorp provided Shearson with confidential, proprietary, and other nonpublic information about GenCorp, and Shearson was given the opportunity to observe, work with, and become privy to business and financial information about GenCorp that did not relate to matters within the public domain. *Id.* ¶¶ 125, 126.

Shearson first served as a financial advisor for GenCorp in June 1986, when Shearson performed for GenCorp a financial analysis of a potential leveraged buyout of GenCorp's tire subsidiary, General Tire, Inc. GenCorp provided Shearson with confidential internal projections, forecasts, and other internal GenCorp information for use in Shearson's analysis. *Id.* ¶ 127. Upon completion of Shearson's analysis and transmittal of the findings, GenCorp elected not to pursue the matter further. *Id.* ¶ 128. All of these event occurred within in a one month period of time.

In November 1986, Shearson contacted GenCorp and offered to represent and assist GenCorp in evaluating the potential acquisition of Goodyear Aerospace. *Id.* ¶ 129. GenCorp agreed to have Shearson represent and assist GenCorp in that matter. *Id.* Shearson provided this assistance with the understanding that it would receive a fee in the event GenCorp opted to proceed with the proposed acquisition. *Id.*

In the course of Shearson's involvement, on December 2, 1986, a GenCorp representative met in New York City with Shearson representatives to determine the possible range of values for the acquisition of Goodyear Aerospace and the likely structure of such an acquisition. *Id.* Among the Shearson personnel attending this meeting and participating in the analysis was Linda Bornheutter. *Id.* In order to facilitate Shearson's analysis, GenCorp provided to Shearson confidential non-public information about GenCorp at this meeting. *Id.* ¶ 125. GenCorp and Shearson discussed and analyzed GenCorp's cost of capital, its ability and willingness to obtain financing, use of its line of credit, use of its cash resources, and the impact of an acquisition on GenCorp's stock repurchase program and pending sale of its television stations. *Id.* ¶ 130.

Thereafter, on December 18, 1986, GenCorp held a management meeting at its Akron, Ohio office to decide whether to proceed with the acquisition of Goodyear Aerospace. *Id.* ¶ 131. Shearson representatives participated in this meeting, made a presentation, and advised GenCorp as to the acquisition. *Id.* The Shearson presentation included a valuation analysis of the acquisition and a discussion of the financial implications and effects of the acquisition on GenCorp's strategy. *Id.* ¶ 132. Once again, Linda Bornheutter participated and attended this meeting. *Id.* Upon completion of Shearson's presentation, GenCorp management met alone and GenCorp's chief executive officer, A. William Reynolds, chose not to proceed with the Goodyear Aerospace acquisition. *Id.* ¶ 133.

Immediately thereafter, GenCorp's management personnel met with Shearson representatives in another room at GenCorp's offices in Akron and informed them that GenCorp was unwilling to make a financial commitment of the magnitude required to purchased Goodyear Aerospace, at least until GenCorp completed its planned, but substantially delayed, stock repurchase program. *Id.* ¶ 134. Shearson representatives responded by saying that the information represented a strategic statement concerning GenCorp and its future. *Id.*

Shearson concluded from this confidential information and from its observations of these confidential deliberations and events that there was a "corporate paralysis" at the top level of GenCorp management. *Id.* Shearson also knew, admittedly from public information, that GenCorp was a relatively liquid company, with low long-term debt, and a substantial unused line of

credit of $600 million, making it an attractive candidate for a hostile takeover, provided GenCorp took no steps in the near term to reduce its liquidity. *Id.* The confidential information Shearson learned assured it that GenCorp would not be taking such steps in the near future.

Subsequent to the December 18, 1986 meeting, Shearson representatives wrote to GenCorp's chairman, Mr. Reynolds, stating that Shearson "enjoyed the opportunity to work with you and your staff on the evaluation and strategy for the potential acquisition of Goodyear Aerospace Corporation." *Id.* ¶ 135. In this letter, Shearson stated that "this joint effort has brought your goals and objectives into better focus for us. We would like to deepen our understanding in order to develop a relationship with you whereby we can offer meaningful ideas and suggestions for implementation of your strategy." *Id.*

Unbeknownst to GenCorp, at the same time that Shearson served as an investment advisor to GenCorp with regard to the Goodyear Aerospace acquisition, Shearson was also advising Wagner & Brown about potential acquisition candidates. *Id.* ¶ 136. Wagner & Brown representatives met with Shearson representatives on or about November 20, 1986 to discuss potential acquisition candidates. *Id.* ¶ 138. At this meeting, Wagner & Brown expressed an interest in acquiring a multi-business company, discrete parts of which could be sold to compensate for expenses incurred in the acquisition. Wagner and Brown was particularly interested in acquiring a company with an aerospace business which could be an attractive post-acquisition divestiture candidate. *Id.* This meeting between Shearson and Wagner & Brown occurred within days of Shearson's agreement to serve as GenCorp's financial advisor with regard to the Goodyear Aerospace acquisition. *Id.* ¶ 129.

In the last quarter of 1986, Shearson purchased in excess of 600,000 shares of GenCorp stock. *Id.* ¶ 147. GenCorp believes this purchase may have occurred shortly after the December 18, 1986 meeting, at a time when Shearson knew of the results of that meeting and knew of Wagner & Brown's interest in acquiring a company that fit GenCorp's profile.

On February 4, 1987, Shearson presented a list of acquisition candidates to Wagner & Brown. The list featured GenCorp as the most attractive acquisition candidate for Wagner & Brown. *Id.* ¶ 141. The Shearson personnel involved in advising Wagner & Brown included Linda Bornhuetter, who had also assisted GenCorp in its consideration of the acquisition of Goodyear Aerospace, and who had been present at the December 18, 1986 meeting with GenCorp's management. *Id.*

On February 26, 1987, Shearson presented to Wagner & Brown a written report devoted exclusively to one acquisition candidate—GenCorp. *Id.* ¶ 142. The report contained the information that Shearson believed was material to Wagner & Brown's decision to proceed with a tender offer for GenCorp, including a discussion of some of the non-public information that Shearson obtained concerning GenCorp during the course of its relationship. *Id.* The Shearson report stated, in part:

> Communications between Reynolds and his management and staff in the operating divisions seems limited. Shearson Lehman Brothers observed "corporate paralysis" in a recent acquisition situation where a decision was needed. In that instance, the operating staff seemed to be well down the path towards making a bid for an acquisition of Goodyear Aerospace before Reynolds came in "at the ninth inning" and vetoed it without discussion. Management appeared disappointed, but accepting of Reynolds' actions.

*Id.*

Shearson obtained this non-public information solely as a result of its relationship as an advisor to GenCorp. *Id.* This information afforded Wagner & Brown inside knowledge of GenCorp's management and attitudes, as well as the unwillingness of GenCorp to make a financial commitment of the magnitude necessary to reduce its attractiveness as a potential takeover target. Shearson may have also communicat-

ed other nonpublic confidential information about GenCorp to Wagner & Brown in the various meetings and conversations that Shearson had with Wagner & Brown, their affiliates, and personnel. *Id.*

Thereafter, Shearson spearheaded and facilitated the attempted hostile tender offer for GenCorp by Wagner & Brown and its affiliates. *Id.* ¶ 143. Shearson not only recommended GenCorp as the most desirable acquisition candidate for Wagner & Brown and its affiliates, but also agreed, through its affiliate SLB Holdings, to provide $1.25 billion in bridge financing for the acquisition. *Id.* Shearson also made presentations to AFG Industries, Inc. ("AFG") to induce, encourage, and persuade AFG to join with Wagner & Brown in the tender offer for GenCorp, and to Wells Fargo Bank to induce, encourage, and persuade Wells Fargo Bank to provide financing for the takeover attempt. *Id.*

On March 18, 1987, within three weeks after Shearson presented its written report to Wagner & Brown, General Acquisitions, Inc., a shell corporation of Wagner & Brown, commenced its hostile take over attempt of GenCorp. *Id.* ¶ 114. Wagner & Brown abandoned the tender offer for Gen-Corp on April 6, 1987, selling all but 108 of their shares into the market, thereby realizing a profit of approximately seventy-nine million in less than eight weeks. *Id.* ¶ 116. Shearson, under its agreement with the Wagner & Brown entities, received, in addition to other fees, fifteen percent of the profits from the sales.

GenCorp claims Shearson owed fiduciary duties to it in both the evaluation of the Tire LBO and Goodyear Aerospace proposed acquisitions. As a result of this fiduciary relationship, GenCorp placed its trust and confidence in Shearson's integrity and fidelity, and disclosed to Shearson confidential, proprietary, and other nonpublic information as to GenCorp's financing policies, internal financial data acquisition policies, management attitudes, and general corporate philosophies which could only have been secured through the intimate and confidential relationship shared between Shearson and GenCorp. *Id.* ¶ 125.

GenCorp asserts in its pleadings claims for breach of fiduciary duty, negligence, unjust enrichment, and fraud as a result of Shearson's and its agent's disclosure of this confidential and nonpublic information. GenCorp advances claims against SLB Holdings for unjust enrichment as well as aiding and abetting Shearson's breach of fiduciary duty. These disclosures and nondisclosures, GenCorp contends, resulted in damages in excess of $258 million.

## I.

"A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Employment of Pratt*, 40 Ohio St.2d 107, 115, 321 N.E.2d 603, 609 (1974), *quoted in Stone v. Davis*, 66 Ohio St.2d 74, 78, 419 N.E.2d 1094, 1097–98, *cert. denied*, 454 U.S. 1081, 102 S.Ct. 634, 70 L.Ed.2d 614 (1981). GenCorp premises its claim for breach of fiduciary duty on three different grounds: agency relationship; de facto fiduciary relationship; and prospective agency. Each of these relationships, claims GenCorp, supports the imposition of fiduciary duties upon Shearson. Absent a fiduciary duty, dismissal of this claim is appropriate. Initially, then, the Court's attention is directed to determining whether a fiduciary relationship existed between Shearson and GenCorp.

### A. AGENCY RELATIONSHIP

GenCorp first claims that Shearson breached certain fiduciary duties owed to it by positing the existence of a principal-agent relationship between the two. Gen-Corp alleges that "Shearson acted as the investment and financial advisor to Gen-Corp in connection with certain possible transactions, including a possible leveraged buy-out of GenCorp's tire subsidiary, General Tire, Inc. and the potential acquisition by GenCorp of the Aerospace Division of Goodyear." Second Amended Answer and Counterclaims ¶ 124. If Shearson was in fact an agent for GenCorp, certain fiduci-

ary duties undoubtedly arose from this status. *See Hobson v. Eaton*, 399 F.2d 781, 784 (6th Cir.1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459 (1969); *Prudential Ins. Co. v. Eslick*, 586 F.Supp. 763, 765–66 (S.D.Ohio 1984). By contrast, Shearson argues that nowhere does Gen-Corp allege in the Counterclaims the existence of a principal-agent relationship between GenCorp and Shearson, nor are facts pleaded which provide an inference that the parties entered into such a relationship.

In *Hanson v. Kynast*, 24 Ohio St.3d 171, 173, 494 N.E.2d 1091, 1094 (1986), the Ohio Supreme Court once again reaffirmed the application of the "control test" for determining the existence of an agency relationship. Under this test, "the relationship of principal and agent or master or servant exists only when one party exercises the right of control over the action of another, and those actions are directed towards the attainment of an objective which the former seeks." *Id.* (citations omitted). It is not necessary that the principal exercise its right of control; it suffices that such a right exist. *Baird v. Sickler*, 69 Ohio St.2d 652, 654, 433 N.E.2d 593, 595 (1982) (per curiam); *see also Taylor v. Checkrite, Ltd.*, 627 F.Supp. 415, 416–17 (S.D.Ohio 1986) ("The central factor under Ohio law in determining whether an agency relationship exists is the right of control vested in the principal."); *Bostic v. Connor*, 37 Ohio St.3d 144, 146, 524 N.E.2d 881, 883 (1988) (test employed to determine whether individual's status was that of a servant or independent contractor); *Griffith v. Rutledge*, 110 Ohio App. 301, 304, 169 N.E.2d 464, 466 (1959); *Restatement (Second) of Agency* § 14 & comment a (1958). Here, a principal-agent relationship can be found only if GenCorp possessed the authority to exercise control over Shearson, and if Shearson proceeded to take some action directed toward the attainment of GenCorp's objectives.

"The degree of control necessary to establish agency has not been clearly defined." *Hanson*, 24 Ohio St.3d at 175, 494 N.E.2d at 1095. There is no minimum threshold that must be met. The determi-nation must be made on a case-by-case basis. Shearson directs the Courts attention to a number of factors identified by the court in *Hanson* as indicative of an alleged principal's control. This nonexclusive list of factors includes: (1) whether the individual is performing in the course of the principal's business rather than in some ancillary capacity; (2) whether the principal provided the materials and place of work; (3) whether the individual offers his services to the public at large or to one individual at a time; (4) the length of employment; (5) the right to terminate the employee at will; and (6) whether the individual was receiving compensation from the principal. *Id.* at 175 & n. 5, 494 N.E.2d at 1095 & n. 5.

Although these factors certainly are relevant in determining whether an agency relationship exists, they are not controlling. Many of these factors are appropriately considered when deciding whether the agent in question is a servant or independent contractor. *See, e.g., Bostic*, 37 Ohio St.3d at 146, 524 N.E.2d at 883–84; *Restatement (Second) of Agency* § 220 (1958). In many cases this distinction is significant, because a principal is bound by the physical conduct of his agent under the doctrine of respondeat superior only when the agent is classified as a servant as opposed to an independent contractor. *See Hanson*, 24 Ohio St.3d at 173, 494 N.E.2d at 1094. Indeed, this was the central issue in *Hanson*.

The extent of the right to control necessary to give rise to an agency relationship is much less than that required to sustain a finding of a master-servant relationship. The principal's right of control need not extend to every aspect of the alleged principal and agent's association. Indeed, in the case of an attorney, for example, the agent may exercise a great deal of discretion.

In fact, most of the persons known as agents, that is, brokers, factors, attorneys, collection agencies, and selling agencies are independent contractors as the term is used in the Restatement of this Subject, since they are contractors but, although employed to perform ser-

vices, are not subject to the control or right to control of the principal with respect to their physical conduct in the performance of the services. However, they fall within the category of agents. They are fiduciaries; they owe to the principal the basic obligations of agency: loyalty and obedience....

*Restatement (Second) of Agency* § 14N comment a (1958). "[I]f the employer is merely interested in the result and does not retain the right to direct the manner in which the work is completed, the relationship is that of employer and independent contractor." *Marshall v. Aaron*, 15 Ohio St.3d 48, 49, 472 N.E.2d 335, 337 (1984); *see also New York, Chi. & St. L. R.R. v. Heffner Constr. Co.*, 9 Ohio App.2d 174, 178, 223 N.E.2d 649, 654 (1967); *Mularski v. Brzuchalski*, 117 Ohio App. 480, 484, 192 N.E.2d 669, 671 (1961).

In the case at bar, Shearson's involvement was that of a financial advisor. Shearson exercised complete discretion in preparing its evaluations of the proposed acquisitions by GenCorp. It is clear that at best, and it is not suggested otherwise by either party, Shearson assumed the role of an independent contractor. The Court makes this fact explicit to illustrate why the factors considered in *Hanson* are not necessarily controlling in the instant case given that a lesser showing of control is required to support a finding that the parties shared a principal-agent relationship. There must exist some degree of control on the part of GenCorp to give rise to a agency relationship, however, since not all independent contractors are agents. *Restatement (Second) of Agency* § 2 comment b (1958).

According to Shearson, the absence of a formal compensation agreement indicates that no principal-agent relationship existed. The compensation arrangement, if any, between two entities is a relevant factor, but it is not usually decisive in evaluating the existence of an agency relationship. The manner and time of payment of compensation is but one of many factors considered. *See Third Fed. Sav. & Loan Ass'n v. Fireman's Funds Ins.*, 548 F.2d 166, 169 (6th Cir.1977); *Industrial Comm'n v. Shaner*, 127 Ohio St. 366, 368, 188 N.E. 559, 560 (1933); *Restatement (Second) of Agency* § 16 (1958). Moreover, here, contrary to Shearson's assertions, a fee arrangement between Shearson and GenCorp is expressly alleged. According to GenCorp, Shearson represented and advised it "with the understanding that it [Shearson] would receive a fee in the event that an acquisition were to materialize." Second Amended Answer and Counterclaims ¶ 129.

There is no suggestion by GenCorp that Shearson possessed the authority to bind it to any obligations. *Funk v. Hancock*, 26 Ohio App.3d 107, 110, 498 N.E.2d 490, 493–94 (1985) (per curiam). Nor is it argued that GenCorp delegated to Shearson the authority to negotiate, contract, or interact with third parties on behalf of GenCorp.

It is clear, however, that Shearson's involvement with GenCorp originated from Shearson's offer to act as a investment and financial advisor with respect to the proposed acquisition of General Tire, Inc. and Goodyear Aerospace. Shearson did indeed undertake to render services to GenCorp with respect to these matters. Equally clear is that Shearson's involvement was limited exclusively to the attainment of GenCorp's objective of evaluating the potential acquisition of these two companies. Further, if GenCorp were to move forward with one or both of the proposed acquisitions, Shearson agreed to assist in the acquisition effort. Obviously, then, GenCorp did in fact delegate certain responsibilities to Shearson with respect to matters within Shearson's expertise. Theoretically, the preparation of the financial analyses could have been handled by GenCorp, but, as a practical matter, a financial investment firm, such as Shearson, was better qualified to perform such a task. Thus, Shearson's acted on GenCorp's behalf to perform a financial analysis of a leveraged buy-out of General Tire, Inc and Goodyear Aerospace.

Although GenCorp only possessed a limited amount of control over Shearson, the right nonetheless existed. It is readily apparent that GenCorp controlled and dictat-

ed the terms of the entire evaluation process. First, GenCorp agreed to take advantage of Shearson's offer to provide financial advice. Second, GenCorp retained and eventually exercised the right to terminate the relationship. And, finally, inherent in this relationship was GenCorp's ability to control the degree of Shearson's involvement in the entire process.

The Court is unwilling to accept Shearson's argument that the offering of financial advice under the facts alleged is insufficient to establish a principal-agent relationship between GenCorp and Shearson. As GenCorp so appropriately argues, to suggest an agency relationship does not develop until the transaction under advisement is commenced is from a practical stand point unrealistic. Individuals such as real estate brokers and attorneys who often provide advice prior to the consummation of a transaction are still considered agents of the customer or clients they serve.

Although the relationship between Shearson and GenCorp did not constitute a master-servant relationship, it did give rise to an agent-principal association. *See Restatement (Second) of Agency* § 14N (1958). Here, although an independent contractor, Shearson acted as an agent of GenCorp and therefore owed certain fiduciary duties. It is sufficiently alleged in the Counterclaims or appropriately inferred therefrom that GenCorp exercised the right of control over Shearson and that Shearson's actions were directed toward the attainment of GenCorp's interests. *Hanson,* 24 Ohio St.3d at 173, 494 N.E.2d at 1094.

## B. DE FACTO FIDUCIARY RELATIONSHIP

■ GenCorp also argues that Shearson assumed the role of a de facto fiduciary as a result of the confidential relationship between the two parties. Ohio law recognizes that "[a] fiduciary relationship need not be created by contract; it may arise out of an informal relationship *where both parties understand that a special trust or confidence has been reposed."* [2] *Stone v. Davis,* 66 Ohio St.2d 74, 78, 419 N.E.2d 1094, 1097–98, *cert. denied,* 454 U.S. 1081, 102 S.Ct. 634, 70 L.Ed.2d 614 (1981) (emphasis added) (citing *Umbaugh Pole Bldg. Co. v. Scott,* 58 Ohio St.2d 282, 286, 390 N.E.2d 320, 323 (1979)); *see also Moore v. Fenex, Inc.,* 809 F.2d 297, 301 (6th Cir.), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987). A confidential relationship is defined as "[o]ne in which one person comes to rely on and trust another in his important affairs and the relations there involved are not necessarily legal, but may be moral, social, domestic or merely personal." *Indermill v. United Sav.,* 5 Ohio App.3d 243, 245, 451 N.E.2d 538, 541 (1982) (quoting *Taylor v. Shields,* 64 Ohio Law Abs. 193, 111 N.E.2d 595 (1951) (second paragraph of syllabus), *quoted in Prudential Ins. Co. v. Eslick,* 586 F.Supp. 763, 766 (S.D.Ohio 1984)).

■ The Ohio Supreme Court has considered this very issue on several occasions. In *Umbaugh,* the court held that the offering or rendition of advice by an

**2.** Shearson also argues that a de facto fiduciary must necessarily have acquired a position of "superiority" and "undue influence" over the purported beneficiary to justify the imposition of fiduciary duties. *Federman v. Stanwyck,* 63 Ohio Law Abs. 178, 108 N.E.2d 339 (1951); *Taylor v. Shields,* 64 Ohio Law Abs. 193, 111 N.E.2d 595 (1951). It is unclear whether this is a correct statement of the applicable law. First, the Ohio Supreme Court in *Umbaugh* and *Stone* did not condition the imposition of fiduciary responsibilities on a prior finding that the fiduciary occupied a position of "superiority" and "undue influence." Moreover, the cases cited by Shearson involved situations in which an alleged fiduciary exercised undue influence over an individual in the context of the terms of a

will and the transfer of a deed. The factual scenario in the case at bar differs significantly, because it involves a fiduciary providing confidential information to a third party; the third party received the direct benefit and Shearson benefitted only indirectly. The Court finds that the imposition of fiduciary responsibilities is not premised on a finding that the de facto fiduciary acquired a position of "superiority" and "undue influence." Certainly, though, a finding that one party possessed superior knowledge as to the subject matter of the underlying transaction may indicate, under certain circumstances, that a relationship of special trust or confidence developed between the two parties.

"institutional lender in a commercial context in which the parties [deal] at arms length" is insufficient to transform the transaction into a fiduciary relationship. *Umbaugh*, 58 Ohio St.2d at 287, 390 N.E.2d at 323. Underlying this conclusion was the court's finding that the record suggested neither "party had, nor could have had, a reasonable expectation that the creditor would act solely or primarily on behalf of the debtor." *Id.* Moreover, under the facts presented, "the borrowers could not reasonably believe that the association was acting in a fiduciary capacity." *Id.* Thus, the court found the record to be void of any evidence that the parties mutually understood "that a special trust or confidence [had] been reposed." *Id.*

Only a few short years later the Ohio Supreme Court, considered the fiduciary responsibilities arising from business transactions. In *Stone*, 66 Ohio St.2d at 78, 419 N.E.2d at 1097, the court reaffirmed the proposition that a fiduciary relationship does not arise from an arms-length relationship when one party has simply offered or provided advice. The court also held, however, that in presenting the subject of mortgage insurance to a loan customer the lending institution bears a fiduciary duty and as part of this duty is required to advise the loan customer the manner in which this insurance may be procured. *Id.* at 80, 419 N.E.2d at 1099. In reaching this conclusion, the court considered the inequality between the parties in the area of loan processing and the bank's direct pecuniary interest in inducing the customer to procure mortgage insurance. These factors coupled with the lender's broaching of the subject and the customer's subsequent expression of interest in obtaining

such insurance resulted in the creation of a special trust or confidence between the two parties. *Id.* 66 Ohio St.2d at 79, 419 N.E.2d at 1098–99.

Finally, one term later, the Ohio Supreme Court imposed a fiduciary duty upon a bank's agent to advise the customers as to the procedure for obtaining immediate life insurance. *Walters v. First Nat'l Bank*, 69 Ohio St.2d 677, 679, 433 N.E.2d 608, 610 (1982) (per curiam). Again, as in *Davis*, the court predicated the imposition of a fiduciary duty upon the bank's superior knowledge of loan processing. *Id.*[3]

Shearson now argues that simply providing business advice does not transform an otherwise business relationship into a fiduciary relationship. Specifically, Shearson claims its involvement in providing GenCorp financial advice does not create a fiduciary relationship between the two. The Court rejects Shearson's contention. Although, again, a fiduciary relationship does not normally arise from an arms-length transaction, Shearson places too much emphasis on the commercial nature of Shearson and GenCorp's relationship. The true inquiry is whether the allegations contained in GenCorp's Counterclaims suggest that GenCorp and Shearson understood that a special trust or confidence existed between them.

The Court is satisfied that the pleadings in GenCorp's Counterclaims provide a clear inference that both parties shared a special trust. Here, Shearson, a well-known corporate financial advisor, solicited an opportunity to advise and represent a publicly-held corporation in connection with a major corporate acquisition. Upon being given this opportunity, GenCorp made Shearson privy

---

**3.** Both parties suggest that *Stone* and *Walters* create exceptions to the rule of law pronounced in *Umbaugh*. Upon review, the Court can hardly construe these three cases as inconsistent. The proposition of law articulated in *Umbaugh* is simply that a fiduciary relationship does not arise out of an informal relationship unless "both parties understand that a special trust or confidence has been reposed." *Umbaugh*, 58 Ohio St.2d at 286, 390 N.E.2d at 323. This is the applicable standard of law applied in both *Stone* and *Walters*. Admittedly, the decisions in *Stone* and *Walters* varied from the general rule that a

fiduciary duty does not arise from a creditor-debtor relationship. *Stone* and *Walters*, however, do not create any exceptions to the standard of law applied in determining whether a fiduciary duty should be imposed. These cases simply presented factual scenarios where both the creditor and debtor understood, or should have understood, that a special trust or confidence existed between the two. In each of these cases, the creditors' superior familiarity with the relevant subject matter provided the inference that a special trust or confidence between the parties existed.

to confidential information about Gen-Corp's finances and strategy, including information that had a direct bearing on Gen-Corp's susceptibility to a hostile takeover attempt. The non-public information acquired by Shearson with respect to Gen-Corp was obviously confidential in nature. Indeed, the confidentiality of such information is apparent. Given the nature of the relationship between GenCorp and Shearson and the confidential financial information furnished by GenCorp to Shearson for evaluation and advisement purposes, both parties must have understood that a special trust or confidence had been reposed in Shearson not to disclose this confidential information to third parties. GenCorp articulated the understanding of its relationship with Shearson in its pleadings. Second Amended Answer and Counterclaims ¶ 125. Shearson's implicit understanding is inferred from the allegations contained in GenCorp's Counterclaims. Certainly, given Shearson's expertise and experience in this field, Shearson cannot deny that non-public information, such as that provided by Gen-Corp, is considered confidential in nature.

The Court is not suggesting that a financial advisor always assumes a fiduciary duty by providing advice or to an entity or individual. Nor does the Court intimate under what circumstances a fiduciary duty vests. It suffices to say, at this juncture in the proceedings, the allegations contained in the Counterclaims and the inferences to be drawn therefrom support the imposition of a de facto fiduciary duty.

### C. PROSPECTIVE AGENCY

■ GenCorp also claims that a theory of "prospective" agency can support the creation of a fiduciary relationship. Essentially, GenCorp argues that, at a minimum, there was a prospective agency relationship between Shearson and GenCorp. Also, GenCorp contends that Shearson, acting as

a prospective agent, permitted and even induced GenCorp, as the prospective principal to reveal confidential information to Shearson. Given that Shearson does not contest the conclusion that the respective parties contemplated entering into a formal agency relationship, the Court's inquiry is essentially reduced to determining whether Ohio law recognizes or would recognize the existence of a theory for vesting a prospective agent with fiduciary responsibilities and duties towards a prospective principal or employer.

The commentary to section 395 of the *Restatement (Second) of Agency* supports the recognition of a such a theory.

A person who, in view of a prospective agency, invites a confidence from or permits the prospective principal to reveal confidential information to him, is subject to the same duties with respect to such information as if, at the time the confidence was given, he were in fact an agent.

*Restatement (Second) of Agency* § 395 comment d (1958).[4] Initially, the Court acknowledges that the allegations contained in the Counterclaims support a claim for relief under section 395, comment d if this is indeed the law in Ohio.

Neither the parties nor this Court uncovered any Ohio case law suggesting a prospective agent bears a fiduciary duty to the prospective principal. Indeed, cases entertaining this issue are very few. The only reference to section 395, comment d found was in the dissenting opinion in *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 801 n. 1 (2d Cir.1980) (Oakes, J., dissenting). There, Judge Oakes remarked that "[a]gency law itself suggests that a party not presently in an agency relationship may nevertheless be subject to the same duties not to use or reveal confidential information provided by another party." *Id.* (citing section 395, comment d). Judge Oakes

---

**4.** *See also id.* § 390 comment e. Comment e provides:

A person is not ordinarily subject to a fiduciary duty in making terms as to compensation with a prospective principal. If, however, as in the case of attorney and client, the creation of the relation involved peculiar trust and

confidence, with reliance by the principal upon fair dealing by the agent, it may be found that a fiduciary relation exists prior to the employment and, if so, the agent is under a duty to deal fairly with the principal in arranging the terms of the employment.

suggested that simply because a pre-existing duty was absent should not prevent the court from finding that a fiduciary relationship existed once the prospective agent agrees to use the confidential information for the principal's benefit. *Id.* at 801.

An Illinois court considered a similar issue. In *Martin v. Heinold Commodities, Inc.*, 117 Ill.2d 67, 109 Ill.Dec. 772, 777, 510 N.E.2d 840, 845 (1987), the named plaintiff, an investor, claimed the defendant broker, breached its fiduciary duty in connection with the plaintiff's purchases of foreign commodities. Specifically, the plaintiff claimed that the defendant generated substantial additional commissions on each commodities transaction by imposing a "foreign service fee" in addition to normal cost and commission fees. The plaintiff alleged that a substantial percentage of the "foreign-service fee" constituted nothing more than an extra commission fee. The plaintiff claimed that the defendant's representatives informed him this fee covered expenses arising from the defendant's business operations in London. The plaintiff asserted that both the amount and the distribution of the foreign-service fees constituted material facts in the decision to invest in the foreign commodities. And the defendant's failure to disclose this information constituted a breach of its fiduciary duty.

While evidently conceding that a fiduciary duty arose upon the plaintiff's agreement to purchase the foreign commodities, the defendant suggested that no fiduciary duty attached during the pre-agency bargaining. The nondisclosure serving as the basis for the suit occurred prior to the creation of an agency relationship.

The Illinois Supreme Court agreed that generally an agent's fiduciary duty is limited to actions occurring during and subsequent to the conception of the agency relationship, but was unwilling to conclude this was an absolute rule of law. The court reasoned that a given plaintiff could possibly plead facts which would support the imposition of a fiduciary duty upon a prospective agent notwithstanding the absence of a formal agency relationship between

the prospective agent and principal. *Id.* The court declined, however, to intimate as to what factual scenario would support finding a fiduciary duty between a prospective agent and a prospective principal. *Id.*

Of course, simply because one court recognizes that in certain instances a prospective agent may owe a duty to the prospective principal or the matter was discussed in one dissenting opinion does not resolve this dispute. The Court's inquiry is compelled by the principles enunciated in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to ascertain how the Ohio Supreme Court would resolve this matter. Given the Ohio court's willingness to incorporate various Restatement sections into Ohio agency doctrine, the Court is inclined follow the Restatement view on this issue. The Restatement suggests, and the Court now concludes, that under certain circumstances, Ohio courts would recognize that a prospective agent might owe a fiduciary duty to a prospective principal. At this juncture in the proceedings, however, the Court need not determine whether under the facts at bar such a duty arises. The Court has already noted that GenCorp alleges the existence of a principal-agent relationship between the parties and that Shearson assumed the role of a defacto fiduciary. *See supra* pp. 1471, 1473. Such allegations are sufficient to state facts regarding the existence of a fiduciary duty.

## II.

Shearson next argues that even if GenCorp has adequately pleaded the existence of a fiduciary duty, dismissal is appropriate given the absence of any allegation suggesting the breach of such a duty. GenCorp claims, and it is alleged in the Counterclaims, that Shearson breached its fiduciary duties in at least three ways: (1) Shearson's disclosure to Wagner & Brown of confidential information regarding GenCorp that Shearson obtained while representing GenCorp on the Goodyear Aerospace acquisition; (2) during the time that Shearson represented GenCorp, Shearson failed to disclose to GenCorp that it was

simultaneously advising Wagner & Brown about potential takeover candidates and that Wagner & Brown expressed an interest in a company fitting GenCorp's profile; and (3) Shearson purchased in excess of 600,000 shares of GenCorp stock in the last quarter of 1986, and there is reason to believe that the purchase occurred shortly after the December 18, 1986 management meeting.

## A. SHEARSON'S DISCLOSURE OF CONFIDENTIAL INFORMATION

■ It is well settled that a fiduciary is under a duty not to disclose or use for his own benefit confidential information acquired in the course of its fiduciary relationship.

> Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent, in competition with or to the injury of the principal, on his own account or on behalf of another, although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge.

*Restatement (Second) of Agency* § 395 (1958) (principal-agent). This duty continues beyond the termination of the fiduciary relationship. *See Patterson v. Pollock*, 84 Ohio App. 489, 491–92, 84 N.E.2d 606, 609 (1948).

> Unless otherwise agreed, after the termination of the agency, the agent:
>
> . . . . .
>
> (b) has a duty to the principal not to use or to disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty. The agent is entitled to use general information concerning the method of business of the principal and the names of the customers retained in his memory,

if not acquired in violation of his duty as agent.

*Restatement (Second) of Agency* § 396 (1958).

■ It is GenCorp's position that Shearson violated its duty of confidentiality by presenting to Wagner & Brown a report containing non-public information with respect to GenCorp's prospective business intentions and inside information regarding management and its attitudes. Shearson received this information, according to Gen-Corp, only as a result of its fiduciary relationship with GenCorp. *See* Second Amended Answer and Counterclaims ¶ 142. Wagner & Brown then allegedly considered this information in making a hostile tender offer for the acquisition of GenCorp at a time in which GenCorp was contemplating a stock repurchase program.

Given these allegations, the Court must reject Shearson's motion. The essence of Shearson's argument is that the information disclosed did not constitute "confidential" or material information. Further, any information provided to Wagner & Brown was only of nature of a opinion, as opposed to factual information. The Court's scrutiny under a Rule 12(b)(6) inquiry does not extend to Shearson's concerns. Questions as to whether the information involved is confidential or material or evenly factually oriented is more appropriately addressed at a later date.

## B. SHEARSON FAILURE TO DISCLOSE ITS RELATIONSHIP WITH WAGNER & BROWN

■ GenCorp alleges that Shearson breached its fiduciary duty by failing to disclose its client relationship with Wagner & Brown at the time Shearson was advising GenCorp about the proposed acquisition of Goodyear Aerospace. Specifically, on or about November 20, 1986, Shearson agreed to assist GenCorp in evaluating the potential acquisition of Goodyear Aerospace. Second Amended Answer and Counterclaims ¶ 129. At the same time Shearson undertook to act as a financial advisor for GenCorp, it also acted as an advisor for Wagner & Brown, who had expressed an

interest in acquiring a company fitting GenCorp's profile. *Id.* at ¶¶ 136, 138. Had this relationship been disclosed, GenCorp contends, it would have never permitted Shearson to assume the role of its financial advisor for purposes of the Goodyear Aerospace acquisition and, more importantly, would have never disclosed confidential information to Shearson—confidential information, it is claimed, Shearson used as a basis for recommending GenCorp as a acquisition candidate to Wagner & Brown. *Id.* at ¶ 139.

A party owing fiduciary duties to another is certainly required to disclose all material information that would affect the willingness of the other to establish or continue the relationship. Shearson's role as a financial advisor for both GenCorp and Wagner & Brown simultaneously posed an inherent conflict of interest. Given Shearson's knowledge of Wagner & Brown's interest in acquiring a company similar to GenCorp, it was essential Shearson inform GenCorp of this relationship. The Court rejects Shearson's suggestion that a breach of duty does not occur simply because it was in possession of confidential information and failed to disclose its involvement with Wagner & Brown. Certainly, in the context of fiduciary duties, disclosure is necessary. Accepting the counterclaimant's pleadings as true, as the Court must, the Court finds the allegations contained in the Counterclaims sufficiently state a claim for breach of fiduciary duty.

## C. SHEARSON'S ALLEGED PURCHASES OF GENCORP STOCK

GenCorp also premises its breach of duty cause of action on its claim that Shearson purchased in excess of 600,000 shares of GenCorp stock in the last quarter of 1986. GenCorp alleges "[i]f Shearson purchased stock with nonpublic inside knowledge that Shearson had gained at the December meeting, and with the knowledge that Wagner & Brown was interested in acquiring a company whose profile fit GenCorp, then that purchase constitutes a breach of fiduciary duty." Second Amended Answer and Counterclaims ¶ 147.

Shearson never disclosed this stock purchase to GenCorp.

This statement of fact, Shearson asserts, does not allege that Shearson traded on the basis of material nonpublic information gained from GenCorp given the conditional language used ("if—then"). Shearson claims that the allegation it purchased securities on the basis of confidential information is founded entirely on conjecture. This, it argues, is insufficient to satisfy the pleading requirements embodied in the Federal Rules of Civil Procedure.

Rule 8 provides that "[a] party may set forth two or more statements of a claim or defense alternately or *hypothetically*, either in one count or defense or in separate counts or defenses." Fed.R.Civ.P. 8(e)(2) (emphasis added).

Rule 8(e)(2) affords a party considerable flexibility in framing his pleading by expressly permitting him to set forth his claims or defenses in an alternative or hypothetical manner. Alternative and hypothetical pleading can be distinguished one from the other in that the former usually is drafted in terms of "either-or" propositions, whereas the latter is formulated as *"if-then"* allegations. This distinction obviously is somewhat mechanical and, as a practical matter, little turns on the differences between the two forms of statement since both are authorized by the rule.

5 C. Wright, *supra* p. 2, § 1282, at 367 (emphasis added). GenCorp's claim is essentially that Shearson purchased GenCorp stock based on non-public information which GenCorp disclosed to it and on its knowledge of Wagner & Brown's interest in acquiring a company whose profile fit GenCorp. Simply because it is phrased as an "if-then" allegation does not warrant dismissal. Given the plain language of Rule 8(e)(2) and the commentary discussed above, it is apparent that this pleading complies with the federal rules. The importance of permitting parties to draft and respond in a hypothetical manner is especially evident where the pleader cannot, without extensive discovery, identify why a party undertook a particular course of ac-

tion. Here, GenCorp believes Shearson's purchase of GenCorp stock may have been motivated by the nonpublic information it received from GenCorp. And, if this belief is true, Shearson breached its fiduciary duty by using for its own account non-public information given to it by GenCorp. This is a practical and straightforward manner in which to assert a claim. Gen-Corp recognizes that if factors other than the non-public information regarding Gen-Corp motivated Shearson's stock purchase, Shearson did not breach any fiduciary duties in this respect. Alternatively, the Court is prepared to treat GenCorp's allegations as asserting that Shearson traded on the basis of non-public information.

■ In addition, Shearson also argues that Ohio law does not recognize a cause of action for breach of fiduciary duty based on insider trading, and, even if such a claim was available under Ohio law, GenCorp's pleading fails to allege sufficient facts to maintain a cause of action on this ground. Having found that Shearson owed GenCorp fiduciary duties, the Court further holds that a breach of this duty may have occurred if Shearson did purchase GenCorp stock on the basis of confidential information acquired in the course of their fiduciary relationship.

■ Ohio law recognizes that a fiduciary is subject to a duty not to make use for purposes of his own self-interest confidential information disclosed to him solely for the principal's use. *Patterson v. Pollock*, 84 Ohio App. 489, 491–92, 84 N.E.2d 606, 609 (1948) (citation omitted) (agency); *see also Restatement (Second) of Agency* §§ 395, 396 (1958). This proposition of law is sufficiently broad to support a cause of action for breach of fiduciary duty where the fiduciary exploits confidential information made privy to it by virtue of the fiduciary relationship for purposes of engaging in insider trading. Other jurisdictions have adopted this view. For example, in *Thomas v. Roblin Indus., Inc.*, 520 F.2d 1393 (3d

Cir.1975), the court commented that "a fiduciary of a corporation who trades for his own benefit on the basis of confidential information acquired through his fiduciary position breaches his duty to the corporation and may be held accountable to that corporation." *Id.*, 520 F.2d at 1397 (Delaware law); *see also Diamond v. Oreamuno*, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969) (New York law). Accordingly, GenCorp properly alleges a breach of fiduciary duty.

### III.

GenCorp contends that Ohio case law supports a claim against Shearson for fraudulent nondisclosure. Shearson contends the allegations contained in the Counterclaims are insufficient to state a claim for relief for fraudulent nondisclosure under Ohio law.

■ The Ohio Supreme Court essentially adopted the Restatement's version of fraudulent nondisclosure theory in formulating Ohio law in *Miles v. McSwegin*, 58 Ohio St.2d 97, 100, 388 N.E.2d 1367, 1369 (1979). *See Central States Stamping Co. v. Terminal Equip. Co.*, 727 F.2d 1405, 1409 (6th Cir.1984) (Ohio has adopted section 551 of the Restatement (Second) of Torts). Admittedly, the Ohio Supreme Court did not expressly state that the Restatement constituted the basis for this theory, but the court did quote and cite section 551 as authoritative precedent. *See Blon v. Bank One*, 35 Ohio St.3d 98, 101, 519 N.E.2d 363, 367 (1988) (citing section 551); *Kaye v. Buehrle*, 8 Ohio App.3d 381, 382, 457 N.E.2d 373, 375–76 (1983) (citing section 551 and comment j). The Court infers that the Ohio Supreme Court implicitly adopted the proposition of law contained in section 551, and accordingly, the Court must give a great a deal of deference to the principals pronounced in section 551 in interpreting the law on fraudulent nondisclosure in Ohio.[5]

---

5. Section 551 provides, in pertinent parts:
(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to

the other as though he has represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

In *Miles*, a real estate broker was found liable for failing to disclose to its contract buyer that a termite inspection had revealed the presence of termites in the home. The defendant had affirmatively represented to the purchaser that the property was a "good solid house." When the defendant subsequently learned that the house was infested by termites, he failed to inform the purchaser of this fact, or otherwise to correct the mistaken belief created by the defendant's prior representation. As a defense, the real estate broker argued that he had no duty to disclose, claiming that duty rested solely upon the bank who obtained the inspection. The Ohio Supreme Court rejected the broker's argument and found that the broker was under a duty to disclose to the purchasers the true condition of the subject property.

In reaching this conclusion, the court reasoned "that parties who directly benefit from and knowingly participate in a transaction tainted with fraud or deceit, *who are under a duty* to disclose their knowledge and fail to do so, are liable for damages directly and proximately resulting from their silence." *Miles*, 58 Ohio St.2d at 100, 388 N.E.2d at 1369 (emphasis added). The court stated:

> 3 Restatement of Torts 2d 119, Section 551, subsections (1) and (2), states, in essence, that a party is under a duty to speak, and therefore liable for nondisclosure, if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another par-

ty to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue of misleading.[6]

*Id.* (citations omitted).

Shearson argues the court's opinion in *Miles* should be read as imposing only a limitation on the traditional rule of caveat emptor. This interpretation, Shearson claims, is supported by succeeding Ohio cases. The court in *Miles* did indeed discuss the applicability of the doctrine of caveat emptor to the facts presented. This discussion, however, arose from the appellant's argument that alternative grounds existed supporting preclusion of any recovery by the plaintiff. The *Miles* opinion considered first the viability of a cause of action for fraudulent nondisclosure. Upon finding the existence of such relief, the *Miles* court then entertained the appellant's second defense. The court then held that the application of the maxim caveat emptor was inappropriate since the defect was undetectable by the purchaser upon reasonable inspection. *Id.*, at 101, 388 N.E.2d at 1379. Thus, the court reaffirmed the latent defect exception to the rule of caveat emptor. *Id.; see Halbrook v. Boso*, No. 87–AP–712, slip op. at 1, 1988 WL 38121 (Ohio Ct.App. Apr. 21, 1988); *Cope v. Dellinger*, No. S–87–27, slip op. at 2, 1988 WL 36378 (Ohio Ct.App. Mar. 31, 1988).

The court's analysis of the appellant's caveat emptor argument is not dependent upon the court's finding of a duty on the

---

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation or trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted

upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*Restatement (Second) of Torts* § 551 (1977).

**6.** As discussed *infra* pp. 1479–80, the duty to "speak" or disclose is not limited to situations where an individual or entity makes a representation which when made was true or believed to be so, but remains silent after he learned that his statement is untrue because of misinformation or a change in circumstances.

part of the real estate broker to disclose the defects in the subject property. This conclusion is unaltered by subsequent cases citing *Miles*. In *Sanfillipo v. Rarden*, 24 Ohio App.3d 164, 167, 493 N.E.2d 991, 995 (1985) and *Eckhart v. Walters*, No. 1155, slip op. at 2, 1983 WL 4437 (Ohio Ct.App. Aug. 10, 1983) (LEXIS State library, Ohio file) (LEXIS pagination), cited by Shearson as interpreting *Miles* a limitation on the traditional rule of caveat emptor, both courts merely cited *Miles* for the proposition that the existence of a latent defect is an exception to the doctrine of caveat emptor. These cases make no suggestion whatsoever that the duty to disclose proposition developed in *Miles* constitutes nothing more than a qualification of the traditional doctrine of caveat emptor.

Shearson also argues that a duty of disclosure attaches "only in situations in which a prior statement or representation containing an error was made which must be corrected." *First Nat'l Bank v. Stewart Petroleum & Drilling*, No. L–84–017, slip op. at 4, 1984 WL 6612 (Ohio Ct.App. Aug. 17, 1984) (LEXIS State library, Ohio file) (LEXIS pagination). Admittedly, in *Miles* the broker represented to the purchasers that the property was "a good solid home"—"a good sound house." *Miles*, 58 Ohio St.2d at 101, 388 N.E.2d at 1370. And this fraudulent representation did serve as the basis for imposing a duty upon the real estate broker to provide complete disclosure. The language of the *Miles* opinion taken as a whole does not suggest, however, that the existence of a prior representation which was when made, or subsequently became, misleading is an essential component of the duty to disclose. Shearson and the court of appeals in *First National Bank* have simply oversimplified their analysis.

 It is clear for a party to successfully maintain an action for fraudulent nondisclosure there must exist a duty on the part of one party to disclose the information to another. *Layman v. Binns*, 35 Ohio St.3d 176, 178, 519 N.E.2d 642, 644 (1988); *Miles*, 58 Ohio St.2d at 101, 388 N.E.2d at 1369; *Kaye v. Buehrle*, 8 Ohio App.3d 381, 382,

457 N.E.2d 373, 375 (1983) ("liability rests upon the seller if, and only if, he is under a duty to disclose the matter in question"). A court will impose such a duty where an individual or entity states or represents a material fact and at the time such statement or representation is communicated the individual or entity knows it to be false or misleading or upon receiving subsequently acquired information he or it knows it to be false or misleading. *Restatement (Second) of Torts* § 551(2)(c) (1977). This was indeed the basis for imposing a duty upon the broker in *Miles*, the bank officer in *Central States Stamping*, and the realtor in *Home Federal Savings & Loan v. Newman*, No. 86–05–030, slip op. at 2, 1987 WL 5505 (Ohio Ct.App. Jan. 20, 1987) (LEXIS State library, Ohio file) (LEXIS pagination).

The Ohio Supreme Court in *Miles* did not, however, suggest that the grounds justifying the imposition of such a duty are limited to only where one party provides false or misleading information. This conclusion is well supported by the Ohio Supreme Court's review of this issue in *Blon v. Bank One*, 35 Ohio St.3d 98, 519 N.E.2d 363 (1988). There, after reaffirming the proposition that "in certain circumstances there exists a duty to speak," the court explained, as an example, that this duty may arise between parties to a business transaction involving a fiduciary relationship. The court stated further that "[s]uch a duty may also arise out of an informal relationship where both parties to a transaction understand that a special trust or confidence has been reposed." *Id.* at 101, 519 N.E.2d at 367 (citations omitted); *see also Central States Stamping Co.*, 727 F.2d at 1409 ("The duty to speak ... may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence.") (citation omitted). And, as is well recognized in the context of real estate transactions, a duty for complete disclosure may attach where such disclosure is necessary to remedy statements and information previously provided that as been rendered misleading or

inaccurate given recent events or discoveries. *Id.* (citations omitted).

A party to a business transaction assumes a duty to disclose:

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation or trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*Restatement (Second) of Torts* § 551(2) (1977).

The Court previously found, see *supra* pp. 1471, 1473, that Shearson owed certain fiduciary responsibilities to GenCorp and therefore Shearson had a duty to disclose any material facts which would affect GenCorp's decision to accept Shearson's invitation to provide financial advisement services. According to GenCorp, the breach of duty occurred when Shearson failed to disclose to GenCorp that it was acting as an advisor to Wagner & Brown at the same time that it was "representing" GenCorp with regard to the potential Goodyear acquisition, and receiving confidential, nonpublic information from GenCorp. Second Amended Answer and Counterclaims ¶ 139. Further, Shearson subsequently failed to disclose to GenCorp that it was assisting Wagner & Brown in its tender offer, or that it had communicated non-public information concerning GenCorp to Wagner & Brown. *Id.* at ¶ 144. Obviously, GenCorp argues, it would not have provided Shearson with confidential information if it had known of Shearson's relationship with Wagner & Brown.

Shearson correctly notes that nowhere in the pleadings does GenCorp allege that Shearson intended to defraud GenCorp by failing to disclose its relationship with Wagner & Brown. The absence of such an allegation, Shearson contends, shatters the foundation of GenCorp's fraud claim and therefore dictates dismissal of this cause of action. While it is undisputed that scienter is a necessary element for what is considered traditional common law fraud, there apparently exist some confusion as to whether negligence or reckless representations will support a finding of fraud for failure to disclose under Ohio law. *Moore v. Fenex, Inc.*, 809 F.2d 297, 303 n. 2 (6th Cir.), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987). This confusion is compounded by the different manner in which courts have characterized this theory. One court stated, in dicta, that a cause of action premised on a theory of fraudulent nondisclosure is a separate and distinct theory from one based on common law fraud. *Id.* Another court construed this theory as simply one of three forms of fraud. *Kaye*, 8 Ohio App.3d at 382, 457 N.E.2d at 375.

Even more troubling is the manner in which the Ohio Supreme Court explained and illustrated this theory in *Miles*. The court first stated that "parties who directly benefit from and knowingly participate in a transaction *tainted with fraud or deceit*, who are under a duty to disclose their knowledge and fail to do so are liable for damages directly and proximately resulting." *Miles*, 58 Ohio St.2d at 100, 388 N.E.2d at 1369. This reference to fraud provides the inference that an allegation of scienter is essential to properly state a claim for fraudulent nondisclosure. This language, however, is qualified by the courts discussion of section 551. There, the court stated what it interpreted to be the essence of section 551:

[A] party is under a duty to speak, and therefore liable for non-disclosure, *if the party fails to exercise reasonable care* to disclose a material fact which may justifiably induce another party to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading.

*Id.* (emphasis added). This language seems to suggest the application of a negligence standard is appropriate. The Court notes that section 551 employs this same "reasonable care" standard and does not contain the term "intentionally" as does section 550 (entitled "Liability for Fraudulent Concealment").

Other jurisdiction have considered the nature of liability under section 551. *See, e.g., United States Nat'l Bank v. Fought,* 291 Or. 201, 630 P.2d 337, 347 (1981) ("despite the inclusion of the concept of due care in the blackletter of the Restatement and Restatement (Second) of Torts, § 551, the section is concerned with conduct which subjects a defendant to liability in an action for damages for deceit"); *Cusick v. Phillippi,* 42 Wash.Ct.App. 147, 709 P.2d 1226, 1231 (1985) (section 551 is applied in actions for frauds or negligent misrepresentation); *Hutson v. Wenatchee Fed. Sav. & Loan Ass'n,* 22 Wash.Ct.App. 91, 588 P.2d 1192, 1198 (1978) (court proceeded on the assumption that a showing of negligence was sufficient); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck,* 127 Wis.2d 127, 377 N.W.2d 605, 613 (1985) (Abrahamson, J., concurring) ("[i]f there [is] a duty to disclose material information, the failure to disclose could constitute intentional or negligent misrepresentation").

 This Court concludes that scienter is not an essential element of an action for nondisclosure under Ohio law. Many factors compel this conclusion. First, *Miles* does not suggest that the nondisclosure must be intentional. In fact, as discussed above, the language in the *Miles* opinion makes express reference to a negligence standard. Second, subsequent Ohio case law suggests an individual's or group's failure to fully disclose facts of a material nature, despite a duty to speak, may serve as grounds for both a fraud and negligent action. In an Ohio court of appeals case that apparently eluded Shearson's exhaustive research, the court commented:

While Ohio case law is clear that intent to deceive is an element of actual fraud, see *Kuehner v. Johnson* (1940), 33 Ohio Law Abs. 401, 410 [34 N.E.2d 996] other related actions may only require "reckless representations," see *Parmlee v. Adolph* (1875), 28 Ohio St. 10; nondisclosure of material facts where there is a duty to disclose, *Miles v. McSwegin* (1979), 58 Ohio St.2d 97 [388 N.E.2d 1367;] *Foust v. Valleybrook Realty Co.* (1981), 4 Ohio App.3d 164 [446 N.E.2d 1122;] "constructive fraud," where "intent" is imputed by law, *Loudenback v. Foster* (1883), 39 Ohio St. 203; *Perlberg v. Perlberg* (1969), 18 Ohio St.2d 55, 58 [247 N.E.2d 306].... Professors Prosser and Keeton opine that the law of misrepresentation is not limited to claims for deceit....

*Hoffman v. Employee Transfer Corp.,* No. 49637, slip op. at 3, 1985 WL 8512 (Ohio Ct.App. Oct. 31, 1985). This language would apparently support liability for fraud, negligence, and strict liability. It suffices for purposes of this case to find that an action for nondisclosure may be premised on fraud or negligence.

The Court's conclusion is buttressed by Ohio's recognition of a cause of action for negligent misrepresentation. *Harlan v. Intergy, Inc.,* 721 F.Supp. 148, 150 (N.D. Ohio 1989); *Haddon View Inv. Co. v. Coppers & Lybrand,* 70 Ohio St.2d 154, 156, 436 N.E.2d 212, 214 (1982). A plaintiff can premise an action for misrepresentation, like nondisclosure, on a claim of fraud or negligence.

This Court and others have characterized this theory of recovery as fraudulent nondisclosure. This label, at least under the instant facts, is a misnomer. Scienter is an essential element in any fraud claim. A cause of action premised on fraud inherently denotes intentional action on the part of

the defendant. Inasmuch as negligent conduct may serve as the basis for a claim for nondisclosure, the theory of recovery should be designated as "negligent" or "fraudulent" nondisclosure depending upon the underlying conduct. Here, GenCorp apparently premises its nondisclosure action on the alleged negligence of Shearson.

■ GenCorp has sufficiently alleged materiality, causation, and reliance. The fact that Shearson was simultaneously advising a well-known corporate raider who had expressed an interest in acquiring a company fitting GenCorp's profile was highly material to GenCorp's decision to allow Shearson to become its investment advisor on the Goodyear Aerospace matter. Second Amended Answer and Counterclaims ¶ 137. With respect to Shearson's claim that causation is lacking, it is clear that if Shearson did in fact disclose confidential information to Wagner & Brown and the raider considered this confidential information in evaluating GenCorp as a likely target, Gencorp has sufficiently alleged a causal connection between Shearson's failure to disclose its relationship with Wagner & Brown and GenCorp's damages.

Finally, GenCorp has sufficiently pleaded the element of reliance. GenCorp alleged that if Shearson had disclosed the facts about its relationship with Wagner & Brown, GenCorp would never have allowed Shearson to become its investment advisor or provided confidential information to Shearson. *Id.* ¶ 139.

Given the Court's finding that an entity may be held liable for negligent or reckless nondisclosure, Shearson's motion for dismissal under Rule 9 is inappropriate. There is no requirement under Rule 9 that plaintiff state with particularity the circumstances constituting negligence or recklessness. Moreover, the allegations in GenCorp's counterclaims, contained in sixty-one number paragraphs, covering over eighteen pages, sufficiently state the circumstances supporting GenCorp's claims,

even if the claim was for fraudulent nondisclosure.

## IV.

■ Shearson also seeks dismissal of GenCorp's negligence claim. GenCorp alleges that Shearson "negligently or recklessly permitted its employees to disclose non-public information about GenCorp to Wagner & Brown and its affiliates," and that Shearson "negligently supervised its employees, thereby permitting them to disclose confidential information about GenCorp to Wagner & Brown." Second Amended Answer and Counterclaims ¶ 146. These allegations, Shearson contends, fail to state a claim for relief under Ohio law.

The essential elements of an action for negligence in Ohio are well settled: the plaintiff must establish (1) the existence of a duty between the parties; (2) a breach of this duty or, stated otherwise, failure on the part of the defendant to conform to standards arising from the duty; and (3) that the defendant's negligent conduct proximately caused plaintiff's injury. *Littleton v. Good Samaritan Hosp. & Health Center,* 39 Ohio St.3d 86, 92, 529 N.E.2d 449, 454 (1988) (wrongful death action); *Strother v. Hutchinson,* 67 Ohio St.2d 282, 285, 423 N.E.2d 467, 469 (1981); *Deeds v. American Sec.,* 39 Ohio App.3d 31, 33, 528 N.E.2d 1308, 1311 (1987) (per curiam). The Court will consider Shearson's motion within the framework of the traditional "duty-breach-proximate-cause" analysis. Initially, the Court reiterates, again, that GenCorp's Counterclaims need not contain a direct allegation on each necessary element of this claim so long as the absent allegation may be drawn from the language as a whole.

## A. EXISTENCE OF A DUTY

■ Shearson first claims that GenCorp failed to plead any facts in its Counterclaims upon which this Court could infer that Shearson owed a duty to prevent disclosure of the allegedly confidential information it received from GenCorp.[7] A plain-

---

7. In fact, Shearson contends GenCorp's negligence claim constitutes "nothing more than a

transparent effort to recast GenCorp's legally insufficient breach of fiduciary duty claim as a

tiff cannot successfully maintain an action for negligence without demonstrating that the defendant owed the plaintiff a duty. *Mitchell v. Cleveland Elec. Illuminating Co.*, 30 Ohio St.3d 92, 93, 507 N.E.2d 352, 353–54 (1987). "Liability for negligence is predicated upon injury caused by the failure to discharge a duty owed to the injured party." *Deeds*, 39 Ohio App.3d at 33, 528 N.E.2d at 1311 (citing *Moncol v. Board of Educ.*, 55 Ohio St.2d 72, 378 N.E.2d 155 (1978)). Absent a duty on the part of Shearson to maintain the confidentiality of the non-public information furnished by GenCorp, no liability accrues and dismissal of GenCorp's negligence claim is appropriate.

Shearson claims there is no general duty to maintain another's confidential information absent some fiduciary or special relationship of trust. Assuming, *arguendo*, this is an accurate characterization of Ohio law, the Court must nonetheless reject Shearson's argument. This Court has already concluded that the allegations contained in GenCorp's Counterclaims state a claim for breach of fiduciary duty. In reaching this decision, the Court found that the allegations presented supported the imputation of fiduciary duties upon Shearson given the nature of its relationship with GenCorp. *See supra* pp. 1468–74. Therefore, as the Court stated above, Shearson owed GenCorp a duty to refrain from disclosing confidential information.[8]

## B. BREACH

GenCorp sufficiently alleged that Shearson breached its duty to maintain the confidentiality of the information provided by GenCorp for evaluation purposes. The alleged breach occurred when Shearson permitted its employees to disclose non-public information with respect to GenCorp's business operations and strategy to a third-party who was at that time evaluating various businesses with an eye towards determining a viable takeover target. In the alternative, the breach could have occurred when Shearson's negligent supervision of certain employees resulted in the disclosure of confidential information about GenCorp. Second Amended Answer and Counterclaims ¶ 146. Given the nature of Shearson's business, the consequences of this disclosure was clearly foreseeable.

## C. PROXIMATE CAUSE

■ "[I]n order for a person to ... recover ... damages for a claimed negligent injury, the act complained of must be the direct and proximate cause of the injury." *Strother v. Hutchinson*, 67 Ohio St.2d 282, 286–87, 423 N.E.2d 467, 470 (1981); *see also Hitchens v. Hahn*, 17 Ohio St.3d 212, 214, 478 N.E.2d 797, 799 (1985) (per curiam). Proximate cause is defined as a "natural and continuous sequence that contributes to produce the result, and without which the result could not have happened." *First Nat'l Bank of Akron v. Cann*, 503 F.Supp. 419, 439 (N.D.Ohio 1980), *aff'd*, 669 F.2d 415 (6th Cir.1982). GenCorp alleges in its Counterclaims that Shearson's action resulted in damages in excess of $258 million. Second Amended Answer and Counterclaims ¶ 142. Thus, GenCorp has sufficiently alleged that Shearson's action were the direct and proximate cause of the injuries sustained by GenCorp.

The Court finds that GenCorp's claim for negligence is sufficient to withstand the scrutiny of a Rule 12(b)(6) motion. GenCorp provides "a short plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2) requires no more.

---

negligence action." Motion to Dismiss at 36. GenCorp is certainly entitled to state as many separate claims as it wishes. Fed.R.Civ.P. 8(e)(2). Certainly, a given factual situation can serve as the basis for more than one type of cause of action.

**8.** Shearson's suggestion that it was unreasonable for it to foresee any type of injury resulting from its disclosure of the confidential information is absurd. Shearson is a sophisticated financial advisor which must have understood the importance of the information provided by GenCorp. Surely Shearson realized what impact the disclosure of such information would have.

## V.

GenCorp's Fifth Claim for Relief alleges that all "defendants have been unjustly enriched at the expense of GenCorp and are, therefore, liable to GenCorp for all the profits realized by them as result of the tender offer." Second Amended Answer and Counterclaims ¶ 61.[9] Shearson argues that nowhere in the Counterclaims does GenCorp allege it conferred any benefit upon Shearson.

 A plaintiff must satisfy three essential elements in order to successfully maintain a cause of action for unjust enrichment: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298, 1302 (1984) (per curiam) (quoting *Hummel v. Hummel*, 133 Ohio St. 520, 14 N.E.2d 923 (1938)); *see also H. Bridges Landscaping and Paving, Inc. v. Lane & Son Paving*, No. 85AP–282, slip op. at 2, 1986 WL 2927 (Ohio Ct.App. Mar. 4, 1986) (LEXIS, States library, Ohio file) (LEXIS pagination) (citation omitted).

Here, it is alleged that the benefit conferred by GenCorp upon Shearson was the confidential information with respect to GenCorp's business operations and strategy. This disclosure, however, does not satisfy the first element of a claim for unjust enrichment. GenCorp did not disclose this confidential information to Shearson so that Shearson could in turn divulge this information to a third party or use the information in determining when to purchase GenCorp stock. GenCorp did not provide access to this proprietary information for Shearson's benefit. Instead, GenCorp disclosed this confidential information to Shearson solely as a means of facilitating Shearson's efforts in advising GenCorp with respect to two proposed corporate acquisitions.

Since the GenCorp did not confer a benefit upon Shearson, it necessarily follows that GenCorp's claims do not allege a factual basis necessary to satisfy the second and third elements of a claim for unjust enrichment. Accordingly, dismissal of GenCorp's action for unjust enrichment is appropriate.

## VI.

 GenCorp alleges in its Sixth Claim for Relief a claim for punitive damages in the amount of $100 million.[10] Shearson contends the allegations contained in GenCorp's Counterclaims are patently insufficient to support the imposition of punitive damages.

The Court must accept for purposes of entertaining this motion GenCorp's claim that Shearson's alleged negligent nondisclosure of its relationship with Wagner & Brown and Shearson's disclosure of confidential information with respect to GenCorp to third parties was maliciously committed or done with reckless disregard of GenCorp's rights. Moreover, a plaintiff need not specially plead or claim punitive damages so long as the evidence warrants their allowance. *Wiebold Studio, Inc. v. Old World Restorations, Inc.*, 19 Ohio App.3d 246, 251, 484 N.E.2d 280, 288 (1985); *Brookridge Party Center, Inc. v. Fisher Foods, Inc.*, 12 Ohio App.3d 130, 131, 468 N.E.2d 63, 66 (1983). The Court finds that GenCorp has sufficiently pleaded facts to proceed on its punitive claim against Shearson. The underlying independent damage claims serving as the predicate for punitive damages are found in

---

**9.** The Court's discussion as to GenCorp's claim for unjust enrichment is limited to review of the unjust enrichment claim alleged against Shearson given the Court's dismissal of SLB Holdings from this action.

**10.** The claim states in its entirety:
GenCorp repeats and realleges each and every allegation contained in paragraphs 102 through 161, as fully set forth herein.

Shearson's actions are heretofore described were malicious or done with wanton and reckless disregard of GenCorp's rights. Accordingly, Shearson is liable to GenCorp for punitive damages.
Second Amended Answer and Counterclaims ¶¶ 162, 163.

GenCorp's claims for breach of fiduciary duty, negligence, and nondisclosure.

## VII.

■■■■ SLB Holdings seeks dismissal of all Counterclaims against it for lack of personal jurisdiction. Fed.R.Civ.P. 12(b)(2). Where a defendant challenges a court's personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of establishing that jurisdiction exists. *Third Nat'l Bank v. WEDGE Group Inc.*, 882 F.2d 1087, 1089 (6th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990); *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1168 (6th Cir.1988); *Welsh v. Gibbs*, 631 F.2d 436, 438 (6th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1517, 67 L.Ed.2d 816 (1981). The plaintiff must make only a prima facie case of jurisdiction in order to avoid dismissal where the district court has chosen, as in this case, to decide the issue solely on the basis of written materials. *Third Nat'l Bank*, 882 F.2d 1087; *American Greetings Corp.*, 839 F.2d at 1168–69. As in the case of other 12(b) motions, the district court is to construe the pleadings in the light most favorable to the plaintiff. *Id.* at 1169.

■■■■ "The law of the forum state determines the extent of the *in personam* jurisdiction of a federal court sitting in a diversity case." *Id.* at 1167 (citing *In–Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 224 (6th Cir.1972)). Ohio's long-arm statute provides, in pertinent part:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action rising from the person's:

(1) Transacting any business in this state; [11]

. . . .

(C) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.

Ohio Rev.Code Ann. § 2307.382 (Anderson Supp.1988).

■■■ Generally, courts have construed section 2307.382(A)(1) as extending personal jurisdiction to the constitutional limits set by the due process clause. *See Id.* at 1167; *R.L. Lipton Distrib. Co. v. Dribeck Importers, Inc.*, 811 F.2d 967, 969 (6th Cir.1987); *In–Flight Devices*, 466 F.2d at 255. Accordingly, the question of whether an Ohio state court or a federal district court sitting in a diversity case can exercise *in personam* jurisdiction under section 2307.382(A)(1) is often reduced to determining whether such an extension of jurisdiction to a non-resident is consistent with due process. "[T]hus an Ohio personal jurisdiction analysis becomes an examination of constitutional limitations." *American Greetings*, 839 F.2d at 1167 (quoting *R.L. Lipton*, 811 F.2d at 969).

Although courts have consistently construed the reach of the long-arm statute as conterminous with the outer limits of the due process clause, the Court's inquiry still requires the resolution of two issues. First, the Court must consider the Ohio long-arm statute, section 2307.382(A)(1), to determine whether SLB Holdings' conduct permits jurisdiction under the apparent reach of the statute. Second, the Court must determine whether an exercise of long-arm jurisdiction of the facts of this case would violate SLB Holdings' due process rights.

■■■■ A two-tier analysis is still required whenever personal jurisdiction is premised solely on conduct of the defendant as delineated in Ohio's long-arm statute because "the cause of action *must* have arisen from that conduct." *Berning v. BBC, Inc.*, 575 F.Supp. 1354, 1357 (S.D. Ohio 1983) (interpreting § 2307.382(B), *amended by* § 2307.382(C)). If the Ohio long-arm statute does not provide a basis for the exercise of personal jurisdiction over the nonresident defendant, jurisdiction is unavailable even if the exercise of such would not violate due process.

---

**11.** GenCorp does not purport to rely on any other or alternative subsection of the Ohio long-arm statute.

■ SLB Holdings contends *in personam* jurisdiction is lacking, in that, GenCorp's claims against SLB Holdings for unjust enrichment and aiding and abetting do not arise from any of the circumstances enumerated in Ohio's long-arm statute. Further, SLB Holdings argues, even if the pleadings satisfy any state statutory requirements, extending the reach of the long-arm statute to bring SLB Holdings before this Court would constitute a violation of SLB Holdings' due process rights. GenCorp contends that all claims asserted against SLB Holdings arise from SLB Holdings' "transacting business in Ohio," Ohio Rev.Code Ann. § 2307.382(A)(1), and that SLB Holdings' involvement in the tender offer for GenCorp is sufficient to satisfy the "minimum contacts" requirement of the due process clause.

In light of the Court's duty to construe the pleadings in favor of the party attempting to invoke the jurisdiction of the forum court, the Court adopts, for purposes of the instant motion, GenCorp's rendition of the facts serving as the basis for the underlying claims against SLB Holdings. GenCorp alleges that SLB Holdings, a Shearson's affiliate, was formed for the purpose of assisting in the financing of a tender offer for GenCorp. Second Amended Answer and Counterclaims ¶ 105, at 17. As a means of assistance, SLB Holdings was to provide one-half of the $2.5 billion in financing required of General Partners for the tender offer. *Id.* ¶¶ 118, 120–21.

Pursuant to a letter agreement dated March 17, 1987, Shearson agreed to act as General Partners' "exclusive financial advisor" in connection with their tender offer for GenCorp." GenCorp's Memorandum in Opposition to Motion to Dismiss Exh. 1–A. SLB Holdings' willingness to provide General Partners a loan of $1.25 billion is indicated in a letter delivered on March 17, 1987 by SLB Holdings to General Partners.

*Id.* Exh. 1–B. This letter contains references that made it explicit that the letter was written in connection with Shearson's March 17 letter agreement and General Partners' planned takeover of GenCorp. *Id.* It is uncontroverted by SLB Holdings that it expressed an interest in considering a loan request by General Partners for purposes of assisting in the financing of General Partners' proposed tender offer for GenCorp.[12] Likewise, however, it is undisputed by GenCorp that SLB Holdings never received an actual request for financing from General Partners nor issued a loan to it.

SLB Holdings' involvement in the financing of the tender offer was also evidenced in General Partners' Offer to Purchase. This document, which was distributed to the thousands of GenCorp shareholders living in Ohio, indicated that SLB Holdings would provide a substantial portion of the $2.5 billion financing for the tender offer. GenCorp's Memorandum in Opposition to Motion to Dismiss Exh. 2.

Thus, GenCorp contends that SLB Holdings' involvement in agreeing to provide financing for the sole purpose of facilitating General Partners' tender offer for GenCorp, an Ohio corporation with its principal place of business in Akron, Ohio, constituted "transacting business" as the term is construed under section 2307.382(A)(1). Specifically, GenCorp argues that its claims against SLB Holdings arise out of the tender offer, which, they allege, is the culmination of Shearson's breach of fiduciary duty, fraud, and negligence. These claims, it is suggested, satisfy the mandate that the cause of action arise from the defendant's business transactions in Ohio. For reasons set forth below, the Court finds GenCorp's argument unpersuasive.

It is clear from the pleadings that SLB Holdings, a Delaware corporation, did not transact business in Ohio. The essence of

---

**12.** Nor does SLB Holdings contest GenCorp's allegations that it had a financial incentive to provide General Partners with the necessary financing to consummate the tender offer. By going forward with the loan, SLB Holdings could receive fees totalling $46.75 million. *See* GenCorp's Counterclaims Exh. B. The rejection of General Partners' loan request, however, obligated SLB Holding to cause Shearson to repay to General Partners all but $1 million of the fees that had been previously paid to Shearson. GenCorp's Memorandum in Opposition to Motion to Dismiss Exh. 1–B.

SLB Holdings' involvement in the instant controversy is its agreement with General Partners, a Texas partnership, to respond within 24 hours to a request for financing. SLB Holdings and General Partners negotiated and executed this agreement in New York. Shapiro Aff. ¶ 4. SLB Holdings is not registered or qualified to do business in Ohio, nor has it paid any state or local taxes. *Id.* at ¶ 6. Further, SLB Holdings does not have any offices, employees, bank accounts or telephone listings in Ohio. *Id.* SLB Holdings' only involvement with Ohio is that it agreed to provide a portion of the financing required for a Texas partnership to tender an offer for the purchase of an Ohio corporation's stock. This tenuous connection, in itself, is clearly insufficient to support a finding that SLB Holdings transacted business in Ohio. Simply furnishing the financial means for a third party to launch a hostile tender offer does not constitute "transacting business." The Court agrees with Shearson that the acceptance of GenCorp's argument would impermissibly extend the reach of the long-arm statute beyond statutory and constitutional bounds. The adoption of such a proposition would permit the exercise of personal jurisdiction over a nonresident so long as the Court can trace a chain of association back from the nonresident defendant to a defendant within the jurisdiction of the Court. The Court declines to accept this proposition.

■ GenCorp attempts to bolster its argument by asserting it is proper for this Court to exercise jurisdiction over SLB Holdings given the size of the proposed transaction underlying this action, the fee arrangement between SLB Holdings and General Partners, and the number of Ohio shareholders involved. The Court certainly agrees these factors illustrate the sizable impact SLB Holdings' involvement would have on Ohio commerce. However, "[u]nder the Ohio rule, the issue is not whether the transaction created an impact on Ohio commerce but, instead, whether the nonresident transacted business in Ohio." *Ohio State Tie & Timber, Inc. v. Paris Lumber Co.*, 8 Ohio App.3d 236, 239, 456 N.E.2d 1309, 1313 (1982).

■ Further, GenCorp cannot impute Shearson's or General Partners' business contacts to SLB Holdings for purposes of assessing jurisdiction. A parent corporation's business contacts with the forum state does not confer personal jurisdiction over the subsidiary. *Fields v. Sedwick Associated Risk, Ltd.*, 796 F.2d 299, 302 (9th Cir.1986) (citing *Uston v. Grand Resorts, Inc.*, 564 F.2d 1217, 1218 (9th Cir.1977) (per curiam)).[13] There are no allegations suggesting that Shearson's control or domination of SLB Holdings warrants treating the two separate corporate entities as one. Nor is it suggested that Shearson ignored SLB Holdings' separate corporate existence. Given GenCorp's initial burden to demonstrate the two companies are alter egos, the Court must presume the two companies are separate. Therefore, Shearson's business contact with Ohio are of no consequence for determining whether SLB Holdings transacted business in Ohio.

Although SLB Holdings does have an indirect connection with Ohio, the Court could hardly characterize its involvement with the forum state as "transacting business." Given that SLB Holdings did not transact business in Ohio, no basis exists for exercising *in personam* jurisdiction over SLB Holdings under the Ohio long-arm statute. Accordingly, the Court need not address whether the exercise of personal jurisdiction over SLB Holdings would be consistent with the concepts of due process.

**13.** Likewise, as a matter of course, the business contacts of a subsidiary do not necessarily subject the parent corporation to jurisdiction in the forum state. *See, e.g., Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 336, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925); *Alvarado–Morales v. Digital Equip. Corp.,* 843 F.2d 613, 616 (1st Cir.1988); *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 373 (5th Cir.1987); *Transure, Inc. v. Marsh and McLennan, Inc.,* 766 F.2d 1297, 1299 (9th Cir.1985). Similarly, the forum state cannot exercise *in personam* jurisdiction over an individual officer, director, or employee merely because such jurisdiction is available over the corporation or business. *Alvarado–Morales,* 843 F.2d at 617; *Weller v. Cromwell Oil Co.,* 504 F.2d 927, 929 (6th Cir.1974).

WHEREUPON, upon consideration and being duly advised, the Court finds the motion of Shearson Lehman Hutton, Inc. and Shearson Lehman Brothers Holdings, Inc. for dismissal of GenCorp's Counterclaims to be partially meritorious. Inasmuch as the defendants seek dismissal of GenCorp's claim for unjust enrichment, the motion is meritorious, and it is, therefore, GRANTED. Insofar as Shearson Lehman Brothers Inc. seeks dismissal of all other claims, the motion is without merit, and it is, therefore, DENIED. The Court finds, however, the motion of Shearson Lehman Brothers Holdings, Inc. for dismissal of all claim against it for lack of personal jurisdiction to be meritorious, and it is, therefore, GRANTED.

IT IS SO ORDERED.